FILED
10/23/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT
MEN

AO 91 (Rev. 11/11) Criminal Complaint AUSA Holly Lanchantin (312) 469-6042

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MICHAEL DE LA ROSA | CASE NUMBER: 26 CR 556 |

**CRIMINAL COMPLAINT**

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about October 23, 2026, at Des Plaines, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, United States Code, Section 2252A(a)(5)(B) and (b)(2) | knowingly possessed material, namely a Samsung Galaxy model S25 Ultra, bearing serial number R5CY34SL89D, IMEI 352512145184493 mobile device, that contained an image of child pornography, as defined in Title 18, United States Code, Section 2256(8)(A). |

This criminal complaint is based upon these facts:

_X_ Continued on the attached sheet.

PAIGE SHPUNT
Special Agent, Federal Bureau of Investigation (FBI)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: October 23, 2026

*Judge's signature*

City and state: Chicago, Illinois

JEANNICE W. APPENTENG,
U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

**AFFIDAVIT**

I, Paige Shpunt, being duly sworn, state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been so employed since approximately July of 2019.

2. As part of my duties as an FBI Special Agent, I investigate violations of federal criminal law relating to child exploitation and child pornography, including violations pertaining to the illegal possession, receipt, and production of child pornography, in violation of Title 18, United States Code, Sections 2252, and 2252A.[1] I have received training in the area of child pornography (as defined in 18 U.S.C. § 2256) and child exploitation, and have observed and reviewed numerous examples of child pornography in multiple forms of media. I have also participated in the execution of multiple federal search warrants, many of which have involved child exploitation and/or child pornography offenses, including warrants to search residences, electronic devices, and social media accounts.

3. This affidavit is submitted in support of a criminal complaint alleging that Michael DE LA ROSA has violated Title 18, United States Code, Section

[1] As used in this affidavit, the term "child pornography" refers to any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(8)(a), or where the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

2252A(a)(5)(B) and (b)(2). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging DE LA ROSA with possession of child pornography, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

4. This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents with whom I have consulted, and records and information I have received from other law enforcement personnel, liaison partners, social media companies, and open-source databases. Because this affidavit is being submitted for the limited purpose of securing a criminal complaint, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

## I. SUMMARY OF FACTS SUPPORTING PROBABLE CAUSE

5. In summary, and as set forth below, on approximately October 23, 2026, the Federal Bureau of Investigation executed a Search Warrant on the premises located at 2165 Lee Street, Des Plaines, Illinois 60018 (the "Subject Premises"), and the person of Michael DE LA ROSA for evidence, instrumentalities, fruits, and contraband related to child pornography offenses. *See* No. 26 M 620. Pursuant to the Search Warrant, FBI agents manually reviewed DE LA ROSA's mobile phone (the

"Subject Phone").[2] Among other things, Special Agents reviewed the Subject Phone's photograph "Gallery" application located therein, and identified several images that constitute child pornography.

## II. FACTS SUPPORTING PROBABLE CAUSE

6. Based on my knowledge of the investigation, since 2024, the FBI has been investigating a contraband website that advertises the sale of sexually explicit images. Through the website's back-end data and cryptocurrency records, law enforcement identified DE LA ROSA as a probable purchaser of child sexual abuse material ("CSAM") from the website. The contours of the FBI's investigation and identification of DE LA ROSA is further described in the Search Warrant for the Subject Premises and DE LA ROSA. *See* Attachment A (Search Warrant Application & Affidavit, No. 26 M 620, incorporated herein by reference).

7. On or about October 21, 2026, the Honorable Jeannice W. Appenteng issued a search warrant for (1) the Subject Premises and (2) DE LA ROSA's person, authorizing the search for evidence, instrumentalities, fruits, and contraband concerning violations of Title 18, United States Code, Sections 2552 and 2552A, including the search of electronic devices. *See* 26 M 620.

---

[2] According to an FBI agent participating in execution of the Search Warrant, DE LA ROSA possessed and claimed sole ownership of the Subject Phone, identified as a Samsung Galaxy S25 Ultra cell phone, bearing serial number R5CY34SL89D, IMEI 352512145184493, and phone number (XXX)-XXX-4468.

8. On or about October 23, 2026, law enforcement executed the Search Warrant at the Subject Premises and on the person of DE LA ROSA. DE LA ROSA was present during the execution of the Search Warrant.

9. During the execution of the Search Warrant for DE LA ROSA's person, law enforcement located a cell phone in the waistband of his shorts, namely a Samsung Galaxy S25 Ultra IMEI 352512145184493. Based on my training and experience, all Samsung cellphones are manufactured outside of the United States.

10. According to agents executing the Search Warrant, including the affiant, DE LA ROSA provided his passcode to law enforcement, allowing law enforcement to manually inspect its contents. During the manual search, special agents observed multiple videos and photos of children that, in my training and experience, constitute child pornography as defined in Title 18, United States Code, Section 2256(8)(A). Specifically, according to special agents, including the affiant, special agents examined the "Gallery" photograph application in the Subject Phone. The special agents observed, among other things, the following examples of videos that constitute child pornography:

a. A 12-minute-and-5-second-long video, titled "b00937.mp4," which depicts two minor females, approximately 8- to 12-years old based on facial features, dress, body and limb size, lack of breast development, and lack of pubic hair. The two minors are shown in various stages of undress, which includes both minors pulling their shirts up to expose their breasts, and pulling their pants and underwear down to expose their genitals. Later in the video, one of the minors removes all of her

clothing, showing a full nude body. Based on my training and experience, the depictions constitute a lascivious display of genitals.

b. A 5-minute-and-2-second-long video, titled "b01367.mp4," which depicts a minor female, fully nude, approximately 7- to 11-years old based on facial features, body and limb size, lack of breast development, and lack of pubic hair. The minor is depicted laying on her back in a bathtub, with her legs lifted in the air, touching her genitals with her hand. The minor then faces away from the camera on her hands and knees to expose her anus, touching her anus with her hands. Based on my training and experience, the depictions are a lascivious display of genitals.

c. A 19-second-long video, titled "@LizabethStmhlu_2092099401267503496_496p.mp4," which depicts a minor female, fully nude, approximately 8- to 12-years old based on facial features, body and limb size, lack of breast development and lack of body hair, kneeling in front of a minor male with no pants or underwear, who appears to be under the age of 12 years old, based on his body and limb size and the development of his penis. The minor female opens her mouth and the minor male inserts his penis into her mouth. The minor female moved her mouth back and forth on the minor male's penis.

d. A 26-second-long video, titled "flyvid_3097.mp4," which depicts a minor female, fully nude, approximately 5- to 8-years old based on facial features, body and limb size, lack of breast development and lack of pubic hair, fully nude dancing in front of the camera, exposing her genitals. Based on my training and experience, the depictions are a lascivious display of genitals.

11. Special agents, including the affiant, interviewed DE LA ROSA during execution of the Search Warrant. According to FBI special agents, including the affiant, the special agents provided DE LA ROSA with a written *Miranda* waiver. An FBI special agent read the *Miranda* waiver to DE LA ROSA. DE LA ROSA reviewed and signed the *Miranda* waiver and agreed to speak with the special agents. According to the special agents, DE LA ROSA made the following material admissions in substance:

a. DE LA ROSA is the sole owner and user of the Subject Phone, namely, a Samsung Galaxy S25 Ultra, bearing serial number R5CY34SL89D, IMEI 352512145184493, associated with XXX-XXX-4468.

b. DE LA ROSA admitted to purchasing CSAM on the contraband website and identified the collections of content he purchased by name.

c. DE LA ROSA admitted to selecting individual files from the collections to download and save to his personal cellphone device, which he maintained in the "Gallery" application of the Subject Phone.

d. DE LA ROSA admitted to using a social media image of his underage coworker to create AI-generated CSAM of her likeness.

e. DE LA ROSA admitted that he knew what child pornography was, and that he knew that certain sexually explicit photos and videos saved to the Subject Phone involved pre-pubescent minors.

12. According to FBI Special Agents, including the affiant, the interview was audio recorded. I do not yet have a copy of the recorded interview.

## IV. CONCLUSION

13. Based on the above information, there is probable cause to believe that DE LA ROSA knowingly possessed material, namely, a Samsung Galaxy model S25 Ultra mobile phone, which bears serial number R5CY34SL89D, IMEI 352512145184493 and phone number (XXX)-XXX-4468, having been mailed, shipped and transported using any means and facility of interstate and foreign commerce, that contained an image of child pornography, as defined in Title 18, United States Code, Section 2256(8)(A), that involved a prepubescent minor and a minor who had not attained 12 years of age,, in violation of Title 18, United States Code, Section 2252A(a)(5)(B) and (b)(2).

FURTHER AFFIANT SAYETH NOT.

Paige Shpunt
PAIGE SHPUNT
Special Agent, Federal Bureau of Investigation

SWORN TO AND AFFIRMED by telephone October 23, 2026.

Jeannice W. Appenteng
Honorable JEANNICE W. APPENTENG
United States Magistrate Judge

# ATTACHMENT A

AO 106 (REV [illegible]/1[illegible]) Affidavit for Search Warrant — AUSA Holly Lanchantin, (312) 469-6042

FILED
10/21/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In the Matter of the Search of:

Case No. 26 M 620

The residence located at 2165 Lee Street, Des Plaines, Illinois 60018, further described in Attachment A-1

**UNDER SEAL**

The person of MICHAEL DE LA ROSA, further described in Attachment A-2

## APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Paige Shpunt, a Special Agent of the Federal Bureau of Investigation, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person, property, or premises:

**See Attachement A-1 & A-2**

located in the Northern District of Illinois, there is now concealed:

**See Attachment B-1 & B-2**

The basis for the search under Fed. R. Crim. P. 41(c) is evidence, instrumentalities, and contraband.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, United States Code, Sections 2252 and 2252A | Possession, receipt, and distribution of child pornography. |

The application is based on these facts:

**See Attached Affidavit**,

Continued on the attached sheet.

Paige Shpunt
*Applicant's Signature*

PAIGE SHPUNT, Special Agent
Federal Bureau of Investigation
*Printed name and title*

Pursuant to Fed. R. Crim. P. 4.1, this Application is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the statements in the Application and Affidavit by telephone.

Date: October 21, 2026

Jeannice W. Appenteng
box SIGN 17P7Q533-4Z336L9Y
*Judge's signature*

City and State: Chicago, Illinois

JEANNICE W. APPENTENG, U.S. Magistrate Judge

UNITED STATES DISTRICT COURT )
)
NORTHERN DISTRICT OF ILLINOIS )

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Paige Shpunt, being duly sworn, state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been so employed since approximately July of 2019.

2. As part of my duties as an FBI Special Agent, I investigate violations of federal criminal law relating to child exploitation and child pornography, including violations pertaining to the illegal possession, receipt, and production of child pornography, in violation of Title 18, United States Code, Sections 2252, and 2252A.[1] I have received training in the area of child pornography (as defined in 18 U.S.C. § 2256) and child exploitation, and have observed and reviewed numerous examples of child pornography in multiple forms of media. I have also participated in the execution of multiple federal search warrants, many of which have involved child exploitation and/or child pornography offenses, including warrants to search residences, electronic devices, and social media accounts.

3. This Affidavit is made in support of an application for a warrant to search:

---

[1] As used in this affidavit, the term "child pornography" refers to any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(8)(a), or where the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

a. the residence located at 2165 Lee Street, Des Plaines, Illinois 60018, further described in Attachment A-1 (the "**Subject Premises**"); and

b. MICHAEL DE LA ROSA (the "**Subject Person**"), further described in Attachment A-2,

for evidence, instrumentalities, fruits, and contraband described further in Attachments B-1 and B-2, concerning possession, receipt, and production of child pornography offenses, in violation of Title 18, United States Code, Sections 2252, and 2252A (the "**Subject Offenses**").

4. The statements in this affidavit are based on my personal knowledge, my training and experience, the training and experience of other law enforcement agents with whom I have consulted, and records and information I have received from other law enforcement personnel, liaison partners, social media companies, and open-source databases. Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, instrumentalities, and contraband of violations of the **Subject Offenses** is located in the **Subject Premises** and on the **Subject Person.**

## I. SUMMARY OF FACTS SUPPORTING PROBABLE CAUSE

5. The requested search warrant is in furtherance of an investigation into an individual, believed to be Michael DE LA ROSA based on the investigation to date, who (1) registered an account on a website, known by law enforcement to offer access

to child pornography for sale and under investigation by the FBI, (2) purchased access to images of child pornography described below, (3) repeatedly accessed the purchased material, and (4) is the **Subject Person** who resides at the **Subject Premises**.

## II. FACTS SUPPORTING PROBABLE CAUSE

### A. Background on Target Site

6. The FBI has an ongoing investigation into the TARGET SITE.[2] The TARGET SITE is an active, publicly available website that advertises the sale of sexually explicit images.[3] According to FBI agents familiar with the TARGET SITE, the TARGET SITE is largely dedicated to images advertised as being obtained via "rips," "leaks," and "hacking." In my training and experience, and through consultation with other law enforcement officers, I understand "rip" to mean downloading all or large amounts of content from a given site or application, often, but not exclusively, including content that is otherwise restricted to paying customers; "leaks" to mean images and videos that were not intended for wider

---

[2] The name of the TARGET SITE, as well as other information about the site, is known to law enforcement but anonymized in this affidavit to protect operational security. The TARGET SITE remains active and disclosure of the name of the site would potentially alert its users to the fact that law enforcement action is being taken against users of the site, thereby provoking users to notify other users of law enforcement action, flee, and/or destroy evidence. Accordingly, to protect the confidentiality and integrity of the ongoing investigation involved in this matter, specific names and other identifying factors have been replaced with generic terms and the website will be identified herein as the TARGET SITE.

[3] The TARGET SITE has gone offline for intermittent periods over the course of the investigation, but was last active at least on or about June 24, 2026.

dissemination, but were then obtained and distributed beyond their initial intent; and "hacking" to mean that an individual would gain unauthorized access to a victim's account or device and obtain images for release. The TARGET SITE also includes images advertised as having been obtained via blackmailing/extorting or otherwise tricking victims into providing or producing explicit images and videos. A substantial portion of the images available on the TARGET SITE depict adults or individuals of unknown age. However, although the TARGET SITE is not dedicated primarily to the sale of sexually explicit images of minors, a subset of the material available for purchase on the TARGET SITE includes such material. As detailed below, the subset that is the focus of this investigation includes images of prepubescent minors and minors, several of which listed ages of the victims depicted as under 18 years old, engaged in sexually explicit conduct.

7. The TARGET SITE is initially accessible without a user needing to register an account. When users without an account visit the TARGET SITE, they can browse material that is available to purchase, as well as information about that material including the number of images available for purchase, descriptions of the available material, customer reviews by previous purchasers, and other information. Generally, the material on the TARGET SITE is available for purchase in two formats: a "set" and a "collection." Based on FBI's investigation of the TARGET SITE, a "set" is a smaller folder of images that usually contains pictures or videos of a single individual or a pair of individuals. A "collection" is a batch of sets sold as a unit. A collection will contain individual folders of the included sets. The collections are often

composed of sets that share a specific characteristic, such as pictures of a certain type of individual (e.g., athletes), or they are sets that are advertised as being obtained or generated by a specific offender.

8. From the home page, a user can find collections available for purchase by navigating to the "shop" page. Collections are identified on the shop page by their title and a selection of preview images. Previews often include a grid of thumbnail images depicting a selection of the full-size images within the set. To purchase a collection, a user must click onto the collection's page, where the user can also see additional information about the collection, often including a description of the collection. For several collections, users could also click a link on the collection page to open a list of individual sets included within a collection once purchased.[4]

9. To purchase content, a user must first register an account with the TARGET SITE. When registering, the user must provide an email address, username, and password. Once logged into their account, registered users can make purchases, view their prior purchases, and contact the website administrator.

10. The TARGET SITE provides instructions for how to purchase content. Specifically, purchases on the website are made through cryptocurrency. Virtual currencies, also known as "cryptocurrency," are digital representations of value that,

[4] A later iteration of the TARGET SITE, first observed in or around October 29, 2024, no longer included a link to open the list of sets included within a collection. Rather, the list of sets was visible directly on the product page by clicking to expand a tab on the collection page for each collection.

like traditional coin and paper currency, function as a medium of exchange (i.e., they can be digitally traded or transferred and can be used for payment or investment purposes). Virtual currencies are a type of digital asset separate and distinct from digital representations of traditional currencies, securities, and other traditional financial assets. The exchange value of a particular virtual currency generally is based on agreement or trust among its community of users. Some virtual currencies have equivalent values in real currency or can act as a substitute for real currency, while others are specific to particular virtual domains (e.g., online gaming communities) and generally cannot be exchanged for real currency. Cryptocurrencies, like Bitcoin ("BTC") and Ether, are types of virtual currencies, which rely on cryptography for security. Cryptocurrencies typically lack a central administrator to issue the currency and maintain payment ledgers. Instead, cryptocurrencies use algorithms, a distributed ledger known as a blockchain, and a network of peer-to-peer users to maintain an accurate system of payments and receipts.

11. After a user purchases content from the TARGET SITE, the user is provided a link to the content on another website, referred to herein as the "CLOUD HOST."[5] The CLOUD HOST link is then accessible to the user on a page in the user's

[5] The actual name of the CLOUD HOST is known to law enforcement but anonymized here to protect operational security. The CLOUD HOST is a cloud storage provider. Based on my training and experience, I know that individuals engaged in illicit online activity often use the CLOUD HOST because the company advertises that its services are "end-to-end" encrypted, meaning that CLOUD HOST employees cannot access

account on the TARGET SITE.[6] That CLOUD HOST link, once visited, allows the user to view or download the purchased material.

12. During the FBI's investigation, the TARGET SITE has moved digital locations and infrastructure multiple times. For example, the TARGET SITE has used a variety of "top level domains."[7] These domains included: TARGETSITE.net, TARGETSITE.info, and TARGETSITE.me.[8] As of on or about June 23, 2026, the site was active at TARGETSITE.pk. Although the technical infrastructure of the TARGET SITE has evolved, the TARGET SITE has retained the same key characteristics. FBI has reviewed the TARGET SITE at various domains from at least on or about August 29, 2023, through at least on or about June 24, 2026, and all versions have had the same main website name, overall layout (such as the ways the website is navigated, the names of sub-pages within the website, etc.), and aesthetic

---

and view content stored in user CLOUD HOST accounts. In addition, CLOUD HOST is not based in the US and is therefore not subject to U.S. legal process.

[6] The user will also receive an email containing a link to that webpage in the user's account on the TARGET SITE where they can access the CLOUD HOST link.

[7] The "top level domain" of a website is represented by the text following the final "dot" of a domain name. For instance, .com or .org are common "top level domains."

[8] Other infrastructure changes observed by the FBI include changing Denial of Service (DOS) protection services; changing providers for Secure Sockets Layer (SSL) certificates, which are used to encrypt information to and from a website and their users; and changing hosting providers and locations for the servers that store the databases and information that makes up the website content. A registrar is a company that sells domain names to the public.

scheme (including colors and fonts), as well as remaining dedicated to the sale of the same types of images using the same business model. I know through my training and experience that frequent changes to website infrastructure is a common tactic used by cybercriminals to evade law enforcement, allowing them to, among other things, thwart ongoing law enforcement investigation through particular providers. I also know that some internet service providers ("ISPs") or registrars will remove clients if they receive reports of a website hosting illegal images such as child pornography (also known as child sexual abuse material or "CSAM"), thereby resulting in cybercriminals changing the domain to allow them to resume operations. Throughout this Affidavit, all iterations of the site are presumed to be the same and referred to as the TARGET SITE.

13. In the course of the investigation, the FBI executed multiple search warrants on accounts associated with the TARGET SITE and made an online undercover purchase from the TARGET SITE, which contained images of both adults and minors engaging in sexually explicit conduct. *See* Nos. 24MJ366; 24MJ665. The FBI has obtained several thousand images believed to show minors engaged in sexually explicit conduct sold by the TARGET SITE, as well as information logged by the TARGET SITE about its sales.

14. Based on review of the information logged by the TARGET SITE about its sales, the email address "aziboa@proton.me" was listed as a buyer who purchased collections containing images of minors engaged in sexually explicit conduct. As

further detailed below, the likely owner and operator of this account was identified as DE LA ROSA, the **Subject Person** currently residing at the **Subject Premises**.

**B. Advertisement of Child Pornography on the TARGET SITE**

15. According to reviewing FBI agents, multiple collections on the TARGET SITE include images of minors engaged in sexually explicit conduct. There were several collections that advertised purported minor victims prior to purchase. These collections included collections referred to herein as Collection A, Collection B, Collection C, and others.[9]

16. For instance, from at least early 2024 through at least in or around December 2024,[10] when a user clicked the link to Collection A's product page, a preview image for Collection A was displayed, as well as the cost to purchase the collection, the number of past purchases of the collection, a series of tags, and the following text, among other information: "Sets contain Nudes, masturbation videos

[9] All referenced collections, except for Collection F, were purchased or accessed and reviewed by FBI Agents as part of the investigation.

[10] Sometime after around early 2024 and before December 19, 2024, The TARGET SITE began to display the victim description directly on TARGET SITE rather than on a linked site. Throughout all observed TARGET SITE iterations, Collection A is consistently represented as being content from the same Moniker. As of June 23, 2026, Collection A's description reads in part "[Moniker] Girls Leaks contains Nudes, Masturbation Videos, Skype calls, and Sex Tapes of teenage girls who have been exposed by [Moniker] from 2023." As of June 23, 2026, the TARGET SITE depicts a preview image containing a clothed individual on the left side of the image, the collection name in the middle of the image, and the same individual with their breasts exposed on the right side of the image.

and snapchat calls where the girls are told what to do by [Moniker]."[11] As observed by FBI personnel on multiple occasions in 2024, the preview image for Collection A showed a grid of nine individuals, several of whom were depicted nude from the waist up, including two victims who appeared to have no breast development and very petite frames.[12] Based on my training and experience, those characteristics are consistent with prepubescence or early stage puberty. At the time of an FBI review conducted in or around December 2023, the Collection A page also included a link to open the list of individual sets included within Collection A. In the list were approximately 69 sets labelled with a name and an age.[13] All of the ages were under 18 years old.

17. The page for Collection B on the TARGET SITE described the collection with terms like "young never before seen teens." In or around February 2024, the Collection B preview image grid included images of 16 "age-difficult" individuals, meaning the individuals in the pictures were not immediately identifiable as minors or adults.[14] The preview image included an individual discussed below as "Minor

[11] The entire collection purported to be content created or obtained by a single individual. He is identified on the TARGET SITE by his internet moniker.

[12] Notably, the nipples on the victims in this preview had all been blurred or otherwise obfuscated, which was different than other collections dedicated to images of adults or individuals of unknown age, wherein the preview grid included several images of unblurred breasts and genitalia.

[13] The ages were written as a number followed by "yo." In my training and experience, I know that "yo" is a common abbreviation for "years old."

[14] As with Collection A and unlike other collections with largely adult content, breasts and genitalia visible within the preview image for Collection B had been blurred.

Victim 1" or "MV1." MV-1 was identified and MV-1's parents were interviewed by Local Police and the FBI. MV-1's parents confirmed that MV-1 was 13 years-old on or around the time of victimization. The Collection B page on the TARGET SITE also had a link to a list of the individual sets included in the collection, which listed numerous victims as being under the age of 18. Approximately 180 of the 250 sets included a name or pseudonym and an age below 18 years old. For example, from at least in and around December 2023 through in and around July 2024, the Collection B victim list included MV-1 as "[Name] (13) BESTSELLER."[15] Based on the naming structure on the TARGET SITE, I understand "(13)" to advertise MV-1 as 13-years-old.

18. Additionally, from at least February 2024 onward, Collection B linked to a page where users could preview the set involving MV-1.[16] The publicly viewable page for MV-1 included a grid of thumbnail images depicting the content within the set, including several images of MV-1 nude with her legs spread with a focus on her genitalia or with her buttocks spread to display her anus. While the grid images are small, several images of MV-1's face and body are consistent with MV-1 being a

[15] On later reviews of the TARGET SITE, MV-1's age was removed, but numerous other minor victims were still labelled with ages under 18 after that date.

[16] At different periods, the TARGET SITE may have changed which victims were "previewable," meaning grids of their included images and videos were viewable before purchase. For example, when the FBI reviewed the victim list from the TARGET SITE in or around December of 2023, MV-1 is not listed as being available for preview on the TARGET SITE.

minor. Specifically, MV-1 has narrow hips, small stature, and facial proportions such as relatively larger eyes.

### C. Undercover Purchase of Collection A

19. In or around February 2024, an online undercover agent used cryptocurrency to purchase multiple Collections from the TARGET SITE, including Collection A. The undercover agent followed the instructions on the TARGET SITE to purchase the Collections using cryptocurrency. Following the purchase, the TARGET SITE presented several CLOUD HOST links, from which the undercover agent accessed and downloaded all the files within. For Collection A, that included approximately 69 sets in folders that were labeled with a name and age, as shown below:

| | | |
|---|---|---|
| [redacted] - 11yo | 2/10/2024 3:08 PM | File folder |
| [redacted] - 16yo | 2/10/2024 3:05 PM | File folder |
| [redacted] - 13yo | 2/10/2024 3:02 PM | File folder |
| [redacted] - 16yo | 2/10/2024 3:02 PM | File folder |

20. The ages on the folders ranged from eleven to sixteen years of age. None of the ages were over the age of 18 years old. The folders downloaded from Collection A match the description of sets included in Collection A advertised on the link on the TARGET SITE prior to purchase. Law enforcement has reviewed the images in Collection A, and there are numerous indicators that the victims are accurately advertised as minors. For instance, several victim folders include screenshots of victim social media where their age is listed. In several folders, the victims themselves communicate their age via video or captioned images. For example, in one

victim folder that was labeled "15yo," a victim sends a clothed image and states that "I'm 15, I turn 16 in [month]". Additionally, in many of the videos part of Collection A, the victim was required to state some combination of their name, their age, and where they are from. For instance, one victim folder advertised as being "(BM)"[17] and "13yo" includes a video where the victim is told to say her age multiple times and she states that she is 13 years old. Law enforcement has identified at least 8 victims that are advertised as minors in Collection A, and each has been confirmed through parental identification or child forensic interviews to be a minor at the time of the images.

21. The folders in Collection A typically contain the "set" for the victim(s) identified in the folder title. The contents frequently include sexually explicit images, as well as other items like non-explicit pictures of victims' social media accounts. For example, one folder in Collection A was labeled with a female name followed by "11yo" and contained pictures and videos of one girl, identified herein as Minor Victim 2 ("MV-2"). While the folder includes clothed images from her social media with an age of 13 years old listed,[18] the folder also includes a screenshot of messages sent, apparently from MV-2 to an unknown individual. In the messages, after being asked

[17] Based on information gathered during this investigation, I understand BM on the TARGET SITE to mean "blackmail."

[18] Using a website that archives the content of internet webpage overtime, I know that as far back as 2017 and as recently as May 1, 2026, the application that MV-2 appears to use to communicate with the subject does not allow anyone under the age of 13 to have an account. Therefore, it is not uncommon for individuals under the age of 13 to represent their age as older on the application itself in order to obtain access.

her age, MV-2 told the unknown individual, "I'm about to tern [*sic*] 12." MV-2's physical appearance was consistent with this age as she is both shorter in clothed pictures next to adults and appears to be prepubescent based on both her facial and overall physical development. The MV-2 folder also contained two videos. One video was approximately 50 minutes long and appeared to be a screen recording of a video call between an unknown individual and MV-2. On the call, the unknown individual gave written instructions to MV-2 to engage in sexual activity on camera. After directing MV-2 to position the camera so that her whole body can be seen, the unknown individual instructed MV-2 to expose and manipulate her genitalia while saying her age and sexually suggestive statements. The video depicted MV-2 touching her genitalia, which was visible and a focal point of the video at that point, as well as making sexual statements to the unknown individual, at the individual's instruction. The second video, approximately 20 seconds in length, shows a close-up focus of a hand and genitalia consistent with MV-2's depiction in the first video masturbating underneath a blanket.

22. Another folder in Collection A listed a female name, referred to herein as Minor Victim 3 ("MV-3"), and the age "13yo." The MV-3 folder also contained images from what appeared to be MV-3's social media profile where she was fully clothed and an age was visible. These images listed her age as 13, although MV-3 appeared to have written below "14, no clue why it says 13." Physically, MV-3 lacks adult musculature and weight distribution occurring after the completion of puberty but shows indications of having begun puberty such as the presence of some pubic

hair in one close-up of MV-3's presumed labia, and the development of breast tissue in several videos and images. Additionally, contextual details such as animal stickers and stuffed animals in a partially nude photo of MV-3 support that she was a minor. The MV-3 folder included one approximately 35-minute-long video that is consistent with the video described above in MV-2's folder, with an unknown individual providing written instructions for MV-3 to touch her breasts and make sexually explicit statements to the actor. As with other victims within Collection A, MV-3 is instructed to repeat her name, age (MV-3 says she's 13 years old), and "I'm a naughty girl" while squeezing her breasts and with her genitals still visible. Over the course of the video, MV-3 was instructed by the unknown individual to "squeeze" her breasts without covering her nipples, and MV-3 complied, doing so while visible from just below her vulva to her face. During the video, MV-3 followed instructions to make sexual statements, "spank" herself, twirl, and jump, often while nude and visible from her thighs upward. A second, approximately 28-second-long video in the MV-3 folder, showed MV-3 dancing fully undressed, visible from the thighs up, massaging her breasts, and running her hand over her genitals.

23. Other folders within Collection A consistently included full or partially nude images of the other victims. Multiple folders included videos similar to those described above, where victims who appeared to be minors and/or were advertised as minors, were instructed to engage in sexually explicit activity, to include manually

stimulating their genitalia, as well as making sexually explicit statements to unknown individuals on video calls.[19]

**D. Site Backup Information**

24. Through its investigation, FBI identified multiple Google email addresses that were associated with accounts used to manage the TARGET SITE. FBI sought and obtained a federal search warrant to search these Google accounts and seize evidence in furtherance of the investigation into the TARGET SITE. *See* Nos. 24MJ366; 24MJ665. One account included multiple saved backup files for the TARGET SITE.

25. Using the backup files that appear to span September 2023 through May 2024, FBI personnel were able to reconstitute TARGET SITE artifacts, re-rendering several elements of the website, including site "backend" information. "Backend" generally refers to the code and data stored for a site to enable functionality for the user interface. Through the backend information, the FBI personnel were able to see information about the TARGET SITE configuration that the website owner or administrator would have access to, as well as user data that was collected and maintained by the TARGET SITE.

26. The FBI was able to use the saved site backup files to obtain information relating to individual users of the TARGET SITE. FBI personnel merged multiple

---

[19] A minority of the sets include only partially nude images or a small number of images.

TARGET SITE databases and database tables to identify buyer usernames, emails, contacts with the site administrator, purchases, dates that the subjects accessed or re-accessed the CLOUD HOST links corresponding to their order, and other information. This information shows the TARGET SITE's log of purchases of sets and collections from the TARGET SITE, often including amounts paid and cryptocurrency used.

27. Additionally, FBI was able to view "site products," which include packages of specific digital content and associated information such as a product name, price, and related links. These products include the Collections that could be purchased on the site, and the CLOUD HOST link that would be presented to site customers upon purchase.[20] The FBI extracted information regarding these products, including the links used for download, the name of collections to which they correspond, and some of their site configuration information. The links used for download were public (i.e., not password protected) CLOUD HOST links. The CLOUD HOST links included links corresponding to Collections A, B, [and C], and in or

[20] The TARGET SITE appeared to list the links as a "ONE TIME [CLOUD HOST] Link," which implies that each link can only be used once and cannot be re-accessed. For that to be true, the TARGET SITE would need to generate a unique link every time a collection is purchased. However, that is not how the TARGET SITE was configured. Rather, the collections each appeared to correspond to a single link that appears to be the same link that all users who purchase the collection would receive. Additionally, the CLOUD HOST link in the TARGET SITE backup for Collection A was the same link that was previously provided for the undercover purchase of Collection A. Accordingly, the links contained in the TARGET SITE backup files were likely unchanging and provided to all purchasing customers.

around July of 2024 FBI accessed and downloaded the content from the CLOUD HOST.[21] For Collection A, the FBI compared the hash values of the files obtained from the CLOUD HOST link in the TARGET SITE backup with the hash values of the files the FBI undercover previously purchased from the TARGET SITE. The hash list was identical, indicating that the content had not changed between the two instances of downloading.

28. Based on FBI review, in the content downloaded by the FBI from the TARGET SITE backup link, Collection B included numerous folders and subfolders of content, consistent with Collection A. These included folders titled with what appeared to be victim names or pseudonyms, often followed by a number in parenthesis. Based on context, law enforcement believes the number is intended to indicate the age of the victim. For instance, one victim folder was named "V1 [Name] (12)", and it included several images and videos of a victim, including victim genitalia and masturbation. It also included one image of unclothed buttocks with the caption over the image saying, "I'm 12 nearly 13 xx". Not all named victim folders included an age, but among those that did, the youngest observed ages were 12. Some were labeled as 18 or "18+."

29. A text file within the folders comprising Collection B includes "girls" that the offender has "gotten nudes from," but stated that not all sets included "hardcore"

[21] FBI subsequently reviewed the downloaded content pursuant to a federal search warrant.

content, because some folders were "less suc[c]essful blackmails." This is consistent with the content of Collection B observed by FBI. For example, one sub-folder titled with a victim name and "(14)" included approximately 25 images and videos of an individual identified herein as "Minor Victim 4" or "MV-4," whose physical development appeared consistent with a minor who has begun puberty (this is assessed based on her roughly adult height and development of pubic hair), but whose frame size and relatively immature breasts are consistent with being 14 years of age. There were some photos depicting MV-4 while dressed, several depicting MV-4 in various states of undress, to include images where her exposed genitals are the focus of an image, and at least one video where an unknown actor provided prompts via a chat application for MV-4 to perform on video or he would "expose" her. In this video, she was completely undressed and told to spread her buttocks and display her anus to the camera, which she did. In another example, a subfolder included approximately 350 images and videos of an individual identified herein as "Minor Victim 5" or "MV-5." In several images and videos, a male appearing under the age of 12, hereinafter "Minor Victim 6" or "MV-6," engaged in oral-genital and hand-to-genital contact with MV-5. These individuals have been identified by FBI, and MV-5 was determined to be 15 years old at the time of the images and videos while MV-6 was determined to be 11 years old.

30. Similarly, based on my review, Collection C downloaded by the FBI via the TARGET SITE backup link had approximately 170 folders named for specific victim sets, as well as other files that were not located within subfolders. The

organization and content in Collection C was more varied than in Collections A and B, in that the naming conventions were not as consistent nor did the content appear to be generated via chat application or blackmail. Some folders indicated victim age; some were labeled more descriptively, such as describing what a victim was wearing. However, several folders indicated minor status with titles such as “10yo” or “14 & 10yo.” The collection included numerous images of individuals that appeared to be minors engaged in sexually explicit conduct. For example, the images in a folder titled “8yo” included two images where a minor uses her hands to manipulate open her genitalia to display to the camera. The child exhibits none of the signs of beginning puberty, including an extremely petite frame relative to elements in her surroundings, such as a bathtub, no breast development and no visible pubic hair.

**E. Subject Activity on the Target Site**

31. Within the reviewed data, a username of “opaturin” with email “aziboa@proton.me” was identified as having registered in or around March 3, 2025. On the following dates, the site recorded “opaturin” making the following purchases:

a. Transaction date: On or about 03/03/2025 06:35:53 AM
   i. User Email: aziboa@proton.me
   ii. Billing Email: opaturin@proton.me
   iii. Action: Purchased access to a collection named “[Collection D]”
   iv. Purchase price: $40 USD
   v. IP address utilized to access download link: 99.50.96.87

b. Transaction date: On or about 11/04/2025 19:59:57 PM
   i. User Email: aziboa@proton.me
   ii. Action: Purchased access to a collection named “[Collection B]”
   iii. Purchase price: $210 USD
   iv. IP address utilized to access download link: 108.147.92.110

c. Transaction date: On or about 11/29/2025 7:06:15 AM
    i. User Email: aziboa@proton.me
    ii. Action: Purchased access to a collection named “[Collection C]”
    iii. Purchase price: $130 USD
    iv. IP address utilized to access download link: 12.74.213.50

d. Transaction date: On or about 5/1/2026 10:44:03 PM
    i. User Email: aziboa@proton.me
    ii. Action: Purchased access to a collection named “[Collection E]”
    iii. Purchase price: $85 USD
    iv. IP address utilized to access download link: Not Listed

e. Transaction date: On or about 5/1/2026 11:07:35 PM
    i. User Email: aziboa@proton.me
    ii. Action: Purchased access to a collection named “[Collection F]”[22]
    iii. Purchase price: $60 USD
    iv. IP address utilized to access download link: 108.147.92.46 and 209.76.51.134

f. Transaction date: On or about 5/11/2026 6:47:21 AM
    i. User Email: aziboa@proton.me
    ii. Action: Purchased access to a collection named “[Collection A]”
    iii. Purchase price: $210 USD
    iv. IP address utilized to access download link: 108.147.92.112

32. The total cost of the purchases of CSAM packages made by “opaturin” was approximately $735 USD.[23] While the FBI does not have the exact content of the CLOUD HOST links at the time they were provided to “opaturin,” based on the

[22] Collections D, E, and F are identified by distinct titles which correspond to files available on the TARGET SITE. These file names are known to law enforcement but anonymized in this affidavit to protect operational security. The TARGET SITE remains active and disclosure of the name of the site would potentially alert its users to the fact that law enforcement action is being taken against users of the site, thereby provoking users to notify other users of law enforcement action, flee, and/or destroy evidence. Accordingly, to protect the confidentiality and integrity of the ongoing investigation involved in this matter, specific names and other identifying factors have been replaced with generic terms.

[23] Total cost listed is the price in US Dollars without transaction fees.

overall content of the site as observed over time by FBI and the content obtained by the FBI under the Collection names, except for Collection F, as explained above, it is reasonable to believe that user "opaturin" obtained largely, if not entirely, the same content. Even if the site, on the date that "opaturin" downloaded content, did not advertise victim ages for these Collection prior to purchase, *after* purchase, folder names such as "Luigi's Girls Collections" and "BoutineLA Scam Auditions – 87 Girls, 10.21 GB" would have conveyed the nature of the collection.

33. "Opaturin" accessed the CLOUD HOST links associated with Collection A on at least four occasions. The most recent date of access contained in the logs was on or around May 11, 2026.[24] "Opaturin" accessed the CLOUD HOST links associated with Collection B on at least two occasions. The most recent date of access contained in the logs was on or around November 28, 2025. "Opaturin" accessed the CLOUD HOST links associated with Collection C on at least one occasion. The most recent date of access contained in the logs was on or around November 29, 2025. "Opaturin" accessed the CLOUD HOST links associated with Collection D on at least one occasion. The most recent date of access contained in the logs was on or around March 31, 2026. "Opaturin" accessed the CLOUD HOST links associated with Collection F on at least three occasions. The most recent date of access contained in the logs was on or around June 3, 2026.

---

[24] As previously noted, the FBI has obtained logs from the site from the most recent backup file dated around June of 2026.

34. In addition to being consistent with Affiant's knowledge and experience regarding characteristics of individuals with an interest in child pornography, as discussed in an earlier section of this Affidavit, spending $735 and continuing to re-access the same material and purchase new material from the same site over a period of at least seven months indicates that that the user of the "opaturin" account has a demonstrated and ongoing interest in child pornography

**F. Identifying "Opaturin" as DE LA ROSA and His Residence at the Subject Premises**

35. As described above, FBI Agents obtained financial information for users purchasing CSAM from the TARGET SITE. Of these transactions, six were associated with the user "opaturin." The purchases made by "opaturin" were processed using cryptocurrency through a Coinbase account. FBI obtained subscriber information for the Coinbase account associated with the purchases made by "opaturin," which showed the following information regarding the Coinbase account holder:

- Display Name: Mike De La Rosa
- Prior email address: michaeldelarosa867@gmail.com
- Account Creation: 01/19/2019
- First Name: Michael De La
- Last Name: Rosa
- Social Security Number: [XXX]-[XX]-5261
- Date of Birth: 09/15/2000
- Address: 2165 Lee Street
- City: Des Plaines
- State: Illinois
- Zip Code: 60018
- Phone number: [XXX]-[XXX]-4468
- Associated Driver License: D[XXXXXXX]0263

36. According to Coinbase policy information with which I am familiar, to create an account for Coinbase, users are required to upload a photograph of an identification card or driver license for identity verification. According to Coinbase records, DE LA ROSA uploaded a copy of his Illinois Driver License, which listed the **Subject Premises** as his primary address. The affiant reviewed the photograph uploaded and found the driver license photo to be consistent with open-source photographs of DE LA ROSA.

37. According to Coinbase records, the Coinbase account associated with the purchases made by "opaturin" on the TARGET SITE has four associated payment methods, all of which are registered to Michael De La Rosa, as well as a bank account at Village Bank & Trust, which also was in the name of Michael De La Rosa. Coinbase records reflect that the Coinbase account also had an associated PayPal account, which showed the following information, including the **Subject Premises**:

a. Customer Name: Michael De La Rosa
b. Email: teammaxkarate@gmail.com
c. Phone number: [XXX]-[XXX]-4468
d. Address: 2165 Lee Street
e. City: Des Plaines
f. State: Illinois
g. Zip Code: 60018

38. The Coinbase return associated with DE LA ROSA's account also included IP activity that shows the same IP user that accessed the Coinbase account also purchased the CSAM on the TARGET SITE. For example, an IP address of 12.74.213.50 was listed as being utilized to access the Coinbase account on or about

December 15, 2025. According to TARGET SITE records referenced above, the same IP address was used on the TARGET SITE to purchase CSAM by the account user "opaturin" on or about November 29, 2025, at approximately 7:06:15 a.m.. Because the IP address was from 2025, subscriber information related to that IP address from that time is currently unavailable.

39. Subscriber information provided from AT&T for phone number XXX-XXX-4468, the phone number associated with the Coinbase account used to make payments by "opaturin" on the TARGET SITE, showed registered user information of the following, including the **Subject Premises** as the subscriber address:

- Name: Michael De La Rosa
- User Address: 2165 Lee St, Des Plaines, IL 60018
- Service Start: 11/06/2012

40. A database search in Accurint, a law enforcement resource utilized for the query of personal identifying information, showed an individual named MICHAEL DE LA ROSA with a date of birth of 09/15/2000, residing at the **Subject Premises**. Accurint showed an associated email address as "Michaeldelarosa867@gmail.com," consistent with the Coinbase account information. Phone number XXX-XXX-4468 was also associated with DE LA ROSA.

41. An open-source search for DE LA ROSA identified a webpage for MBD Martial Arts in Des Plaines, Illinois, featuring a profile for "Michael De La Rosa" who is listed as a "Head Coach" with specialties in Brazilian Jiu-Jitsu, Muay Thai, Shorei-Goju Ryu Karate, and Modern Arnis. The photograph of the Head Coach is consistent with an Illinois Driver's License photograph for DE LA ROSA. The courses offered at

MBD Martial Arts primarily consist of youth courses, including offerings for "Mini Dragons," or children as young as 3 years old. The academy offers daily courses for children including fundamentals, Youth MMA, Teen MMA, Youth Brazilian Jiu-Jitsu (BJJ), Muay Thai (teen) and two adult courses – Adult MMA and Adult Brazilian Jiu-Jitsu. Under the "Coach Bio" tab for DE LA ROSA, the page lists his class programs as all youth courses, with "appointment services" for adults. According to the course calendar as advertised on the website for the week of October 11, 2026, through October 17, 2026, DE LA ROSA is scheduled to teach Youth MMA Beginners, Youth MMA, Youth MMA Advanced, Muay Thai (16–18-year-olds), "Little Dragons" (5–6-year-old martial arts), and Youth BJJ, each on multiple occasions.

42. According to law enforcement databases, associated vehicle information for DE LA ROSA included a gray Volkswagen Passat, with Illinois registration plate AJ16357, which is registered to Individual A, believed to be DE LA ROSA's mother. This vehicle was observed by the Affiant in the driveway of the **Subject Premises** and being exclusively used by DE LA ROSA during several surveillance periods in September and October of 2026.

43. On September 24, 2026, the affiant surveilled the **Subject Premises** and observed the gray Volkswagen Passat parked outside the **Subject Premises**. The affiant observed a female consistent with a Secretary of State driver license photo for Individual A exit the residence and leave in a different vehicle.

44. On October 13, 2026, the affiant surveilled the **Subject Premises** beginning at approximately 7:35 p.m. According to the MBD Martial Arts Academy

website, DE LA ROSA was scheduled to teach a youth martial arts course until 8:00 p.m. that day. At approximately 9:12 p.m., Individual A returned to the **Subject Premises** in a vehicle with a distinct MBD Martial Arts Academy advertisement on the car. At approximately 9:13 pm, the affiant observed DE LA ROSA, consistent with a Secretary of State driver license photo for DE LA ROSA, return to the **Subject Premises** in the Volkswagen Passat, bearing IL registration plate AJ16357. DE LA ROSA sat in the vehicle until approximately 9:21 pm, then walked to the south side of the residence, opened the gate to the fence, and entered the **Subject Premises** through the south side garage pedestrian door, carrying a large dark colored backpack. A moment later, DE LA ROSA was observed through the West facing windows on the front of the house, in what appeared to be a kitchen.

45. On October 14, 2026, FBI agents began surveillance on the **Subject Premises** beginning at approximately 1:45 p.m. According to the MBD Martial Arts Academy website, DE LA ROSA was scheduled to teach a youth course at MBD Martial Arts Academy beginning at approximately 3:00 p.m. Surveilling agents did not observe the Volkswagen Passat at the **Subject Premises**. Surveilling Agents/Task Force Officers traveled to MBD Martial Arts Academy, and observed the Volkswagen Passat parked in the rear of the business. Also on this date, surveilling Agents observed Individual B, believed to be the sister of DE LA ROSA, at the residence, leaving the **Subject Premises** through the same side door and gated fence DE LA ROSA previously used on October 13, 2026.

## IV. BACKGROUND INFORMATION CONCERNING CHILD PORNOGRAPHY

46. Based upon my own knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, computers affect the methods used by people who possess, receive, distribute, and transport child pornography in these ways:

a. Those who create child pornography can produce both still and moving images directly from a common video or digital camera, and other devices that create video and still images, including most cellular telephones. Images from such devices can be transferred to a computer by attaching the device to the computer using a cable, or by uploading images from the device's memory card directly onto the computer or into a storage account accessible from any computer with the capability of accessing the internet (sometimes referred to as a "cloud" account). Once on the computer, images can then be stored, manipulated, transferred, or printed. This includes transfer to some of the same types of devices that are commonly used to create child pornography, such as cellular telephones, as well as other computers. As a result of this technology, it is relatively inexpensive and technically easy to produce, store, and distribute child pornography.

b. The Internet allows any computer to connect to another computer. Electronic contact can be made to millions of computers around the world. The Internet allows users, while still maintaining anonymity, to locate (i) other

individuals with similar interests in child pornography; and (ii) websites that offer images of child pornography. Child pornography collectors can use standard Internet connections, such as those provided by businesses, universities, and government agencies, to communicate with each other and to distribute child pornography. They can also distribute and collect child pornography with peer-to-peer ("P2P") file sharing, which uses software to link computers together through the Internet to form a network that allows for the sharing of digital files among users on the network. These communication links allow contacts around the world as easily as calling next door. Additionally, these communications can be quick, relatively secure, and as anonymous as desired. All of these advantages, which promote anonymity for both the distributor and recipient, are well known and are the foundation of transactions between child pornography collectors over the Internet.

c. The computer's capability to store images in digital form makes it a common repository for child pornography. Internal and external computer hard drives typically store vast amounts of data, and hard drives with the capacity of 500 or more gigabytes—which can store tens of thousands of images at very high resolution—are not uncommon. Other electronic storage media, such as thumb drives and memory sticks, can store hundreds of images and dozens of videos. Likewise, optical storage media, which includes CD-ROMs and DVDs, and electromagnetic storage media also can hold hundreds of images and multiple videos. Such electronic, optical, and electromagnetic storage media are very commonly used by those who collect child pornography to store images and videos depicting children engaged in

sexually explicit activity. Agents who execute child pornography search warrants often find electronic, optical, and/or electromagnetic storage media containing child pornography in the same location as or near the computer that was used to obtain, access, and/or store child pornography.

47. My training and experience, and the training and experience of other agents whom I have consulted, have shown the following:

a. Individuals who possess, transport, receive, and/or distribute child pornography often collect sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or other images, as well as literature describing sexually explicit activity involving children. Such individuals frequently store their child pornography on multiple electronic, optical, and/or electromagnetic storage media, including not only their computer, but also on external hard drives, CD-ROMs, DVDs, memory sticks, thumb drives, cell phones, and other such media. Many of these individuals also collect child erotica, which consist of items that may not rise to the level of child pornography but which nonetheless serve a sexual purpose involving children.

b. Individuals who possess, transport, receive, and/or distribute child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica. The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, P2P, e-mail, e-mail

groups, bulletin boards, Internet Relay Chat, newsgroups, instant messaging, and other similar interfaces.

c. Individuals who possess, transport, receive, and/or distribute child pornography often collect, read, copy, or maintain names, addresses (including e-mail addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange, or commercial profit. These names may be maintained in the original medium from which they were derived, in address books or notebooks, on computer storage devices, or merely on scraps of paper.

d. The majority of individuals who possess, transport, receive, and/or distribute child pornography almost always maintain their collections in the privacy and security of their homes or other secure location. These individuals may keep their collections in locked containers including filing cabinets, safes, or lockboxes. These individuals may also maintain their collections in password-protected or encrypted electronic media. They may keep these passwords, and other information concerning their use of the computer, on handwritten or printed notes that they store in personal areas and around the computer.

e. Possessors, traders and distributors of child pornography sometimes store their illegal images and videos online in remote storage accounts. Therefore, any records, documents, invoices and materials in any format or medium that concern online storage or other remote computer storage could indicate that a

person at the **Subject Premise**s is storing illegal material in an online storage account.

f. Files, logs, and records relating to P2P files can contain the names of files sent through the P2P service, as well as the date and time the files were transferred. These records could help identify the individual who transferred the child pornography images at the **Subject Premises**. Additionally, these records can provide historical information about the trading of child pornography by individuals at the **Subject Premises.**

## V. SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

48. Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most or all electronic storage media items (*e.g.* computer hardware, computer software, computer-related documentation, and cellular telephones) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a. Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant.

This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b. Searching electronic storage media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

49. In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. In cases involving child pornography where the evidence consists partly of graphics files, the monitor(s) may be essential for a thorough and efficient search due to software and hardware configuration issues. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

50. In addition, electronic storage media such as a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of

the crime(s), within the meaning of 18 U.S.C. §§ 2251 through 2256, and are subject to seizure as such if they contain contraband or were used to obtain or store images of child pornography.

51. The warrant I am applying for would permit law enforcement to obtain from DE LA ROSA the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock electronic devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at

the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under

this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than a certain number of hours have elapsed since the device was last unlocked or (2) when, within a certain number of hours, the device has not been unlocked using a fingerprint and the passcode or password has not been entered. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g. Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of DE LA ROSA, if found at the subject premises and reasonably

believed by law enforcement to be a user of the device, to the fingerprint scanner of the device;[25] (2) hold the device in front of the face of DE LA ROSA and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## VI. PROCEDURES TO BE FOLLOWED IN SEARCHING ELECTRONIC STORAGE MEDIA

52. Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant will authorize the removal of electronic storage media and copying of electronically stored information found in the premises described in Attachment A so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol.

53. The review of electronically stored information and electronic storage media removed from the premises described in Attachment A-1 and from the person described in Attachment A-2 may include the below techniques. These techniques are a non-exclusive list, and the government may use other procedures if those procedures are designed to minimize the review of information not within the list of items to be seized as set forth in Attachment B-1 and Attachment B-2:

a. examination of categories of data contained in such computer hardware, computer software, and/or memory storage devices to determine whether

[25] Law enforcement will select the fingers to depress to the fingerprint scanner to avoid compelling the user of the device to disclose information about his or her knowledge of how to access the device.

that data falls within the items to be seized as set forth in Attachment B-1 and Attachment B-2;

b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B-1 and Attachment B-2;

c. surveying various file directories and folders to determine whether they include data falling within the list of items to be seized as set forth in Attachment B-1 and Attachment B-2;

d. opening or reading portions of files, and performing key word or concept searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B-1 and Attachment B-2; and

e. using forensic tools to locate data falling within the list of items to be seized as set forth in Attachment B-1 and Attachment B-2.

f. The government will return any electronic storage media removed from the premises described in Attachment A within 60 days of the removal unless, pursuant to Rule 41(c)(1), (2), or (3) of the Federal Rules of Criminal Procedure, the removed electronic storage media contains evidence or contraband, or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.

## VII. CONCLUSION

54. Based on the aforementioned information, Affiant submits that there is probable cause to believe that DE LA ROSA residing at the **Subject Premises**, is involved in the TARGET OFFENSES and that there is probable cause to believe that evidence, instrumentalities, fruits, and contraband of the offenses will be located at the **Subject Premises** or on the **Subject Person** of DE LA ROSA, including any electronic devices and/or cellphones found at the **Subject Premises** or on the **Subject Person** that law enforcement reasonably believe belong to DE LA ROSA. In consideration of the foregoing, Affiant respectfully requests that this Court issue a warrant to search the **Subject Premises**, described in Attachment A-1 and on the **Subject Person** of DE LA ROSA, described in Attachment A-2 for the items described in Attachment B-1, and to use the biometric features of DE LA ROSA as described in Attachment B-2, to access any electronic devices seized under this warrant.

Paige Shpunt
PAIGE SHPUNT
Special Agent
Federal Bureau of Investigation

Sworn to and affirmed by telephone on October 21, 2026.

Jeannice W. Appenteng
box SIGN 17P7Q533-4Z336L9V
HONORABLE JEANNICE W. APPENTENG
United States Magistrate Judge

## <u>ATTACHMENT A-1</u>

## DESCRIPTION OF PREMISES TO BE SEARCHED

The **Subject Premises** is located at 2165 Lee Street, Des Plaines, Illinois 60018. According to open-source searches and surveillance, the residence is a single-family home with tan colored siding, brown brick, and a brown roof. There is a concrete driveway leading to the attached garage. Above the garage, the numbers “2165” are affixed to the siding. Photographs of the exterior of the **Subject Premises** are below:





## ATTACHMENT B-1

## LIST OF ITEMS TO BE SEIZED

Evidence, instrumentalities, fruits, and contraband concerning violation of Title 18, United States Code, Sections 2252 and 2252A, as follows:

1. Documents in any format and medium pertaining to the sexual exploitation of children, and to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C. § 2256(8).

2. Computers, phones, tablets, electronic gaming devices, media players, computer hardware, computer software, and video display monitors that, based on their location, appearance, and/or other information learned at the time of the execution of the warrant are reasonably believed to be connected to the **Subject Offense** or to be accessible to, used by, or in the possession of DE LA ROSA. This includes, but is not limited to, materials used to: visually depict child pornography as defined in 18 U.S.C. § 2256(8); display or access information pertaining to child pornography; display or access information pertaining to sexual activity with children; communicate with children; or advertise, distribute, possess, or receive child pornography, or otherwise access or transmit information pertaining to child pornography or other sexual activity with children. The computer media and electronic devices to be searched shall, based on their location, appearance, and/or other information learned at the time of the execution of the warrant, be reasonably believed to be accessible to or possessed or used by DE LA ROSA or linked to the **Subject Offense**.

3. Any passwords, encryption keys, and other devices that may be necessary to access any electronic equipment described above.

4. Any items demonstrating the presence or absence of computer software that would allow others to control any electronic equipment, and the presence or absence of security software designed to detect such malicious software.

5. Any items demonstrating the attachment of other computer hardware or storage media.

6. Any counter-forensic programs and associated data that are designed to conceal or eliminate data.

7. Any computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

8. Items in any format and medium containing names, addresses, and/or other contact information of individuals who may have been contacted by individual(s) located at the **Subject Premises** by use of the computer or by other means concerning the use of minors to engage in illegal sexual activity and the possession, receipt, or distribution child pornography, as defined in 18 U.S.C. § 2256(8).

9. Items in any format and medium depicting a relationship between DE LA ROSA and the victims that pertain to the **Subject Offense**.

10. Any items in any format or medium of child pornography as defined in 18 U.S.C. § 2256(8); visual depictions of minors engaged in sexually explicit conduct

as defined in 18 U.S.C. § 2256(2), or of child erotica; items pertaining to the enticement of minors to engage in illegal sexual activity; or items evincing the **Subject Offense** or otherwise relating to the sexual exploitation or abuse of children.

11. Any items identifying persons transmitting child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

12. Any items concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

13. Any items concerning membership in online groups, clubs, or services that make accessible child pornography to members.

14. Any items that concern any accounts with Internet Service Providers, including but not limited to sales receipts, bills, and notes.

15. Documents, in any format or medium, pertaining to occupancy or ownership of the **Subject Premises** or the Subject Accounts, such as passwords, utility and telephone bills, mail envelopes, or addressed correspondence.

16. Any items that can be used to identify minor children present in the **Subject Premises**.

17. Any records, keys, or account information related to cryptocurrency accounts which may have been used to purchase child pornography.

18. During the execution of the search of the **Subject Premises** described in Attachment A, law enforcement personnel are authorized to, for devices at the

premises and reasonably believed by law enforcement to be used by DE LA ROSA: (1) press or swipe the fingers (including thumbs) of DE LA ROSA to the fingerprint scanner of the device; or (2) hold a device found at the premises in front of the face of DE LA ROSA and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the device.

## ATTACHMENT A-2

## DESCRIPTION OF PERSON TO BE SEARCHED

The person of MICHAEL DE LA ROSA, date of birth 09/15/2000, currently residing at 2165 Lee Street, Des Plaines, Illinois, 60018. According to the Illinois Secretary of State, DE LA ROSA is approximately 5 foot and 11 inches and 145 pounds, with brown hair and brown eyes, as depicted below. A photo from his Illinois Driver's License and from his employer website are below:






# MICHAEL DE LA ROSA

Head Coach

- Brown Belt, Brazilian Jiu-Jitsu (Focused Fight Team)
- Certified Muay Thai Instructor (Focused Fight Team)
- 2nd Degree Black Belt, Shorei-Goju Ryu Karate (International Martial Arts Council)
- High Green Belt, Modern Arnis (International Modern Arnis Federation)

## ATTACHMENT B-2

## LIST OF ITEMS TO BE SEIZED

Evidence, instrumentalities, fruits, and contraband concerning violation of Title 18, United States Code, Section 2252 and 2252A, as follows:

19. For any smartphone, tablet, or storage medium whose seizure is otherwise authorized by this warrant (hereinafter, "PHONE, TABLET, STORAGE MEDIUM"):

A. Documents in any format and medium pertaining to the sexual exploitation of children, and to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C. § 2256(8).

B. any records or information relating to the advertisement, distribution, transportation, receipt, access, possession, creation, production, storage, transmission, or editing of any visual depictions of child pornography, as well as any information relating to the identity of any person involved in such actions or any person depicted in such visual depictions;

C. evidence of who used, owned, or controlled the PHONE, TABLET, or STORAGE MEDIUM at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

D. evidence of software that would allow others to control the PHONE, TABLET, or STORAGE MEDIUM such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

E. evidence of the lack of such malicious software;

F. evidence indicating how and when the PHONE or TABLET was accessed or used to determine the chronological context of computer access, use, and events relating to the Subject Offenses and to the computer user;

G. evidence indicating the PHONE, TABLET, or STORAGE MEDIUM user's knowledge regarding the age of the minors, and/or intent to entice minors through the purchase of gift cards and other items typical for use by minors;

H. evidence of the attachment to the PHONE or TABLET of other storage devices or similar containers for electronic evidence;

I. evidence of programs (and associated data) that are designed to eliminate data from the PHONE or TABLET;

J. evidence of the times the PHONE or TABLET was used;

K. passwords, encryption keys, and other access devices that may be necessary to access the PHONE, TABLET, or STORAGE MEDIUM;

L. documentation and manuals that may be necessary to access the PHONE or TABLET or to conduct a forensic examination of the PHONE or TABLET;

M. records of or information about Internet Protocol addresses used by the PHONE or TABLET;

N. records of or information about the PHONE or TABLET's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses that relate to the Subject Offenses;

O. Any records or account information related to the purchase of cryptocurrency that may have been used to obtain child pornography;

P. Any items pertaining to social media accounts, including but not limited to, Snapchat, Telegram, TikTok and Instagram, that were used to entice minors or obtain child pornography;

20. As used above, the terms "records" and "information" include all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

21. The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

22. The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic or optical media.

23. During the execution of the search of DE LA ROSA described in Attachment A-2, law enforcement personnel are authorized to, for devices on the person and reasonably believed by law enforcement to be used by DE LA ROSA: (1) press or swipe the fingers (including thumbs) of DE LA ROSA, to the fingerprint scanner of the device; or (2) hold a device found on DE LA ROSA in front of the face of DE LA ROSA and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

**ADDENDUM TO ATTACHMENTS B-1 AND B-2**

Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant authorizes the removal of electronic storage media and copying of electronically stored information, including cell phones, that are described in Attachment B and found in the premises described in Attachment A so that they may be reviewed in a secure environment for information consistent with the warrant.

Subject to the exceptions to the warrant requirement as recognized by law, the government may search only those electronic storage media that fall within the criteria as described in Attachment B, which may either be all electronic storage media found in the premises or only a subset of the electronic storage media found in the premises.

The government's review of removed electronic storage media shall be conducted pursuant to the following protocol:

The government must make reasonable efforts to use methods and procedures that will locate those categories of data, files, documents, or other electronically stored information that are identified in the warrant, while minimizing exposure or examination of categories that will not reveal the items to be seized in Attachment B.

The review of electronically stored information and electronic storage media removed from the premises described in Attachment A may include the below techniques. These techniques are a non-exclusive list, and the government may use other procedures if those procedures are designed to minimize the review of information not within the list of items to be seized as set forth in Attachment B:

a. examination of categories of data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B;

c. surveying various file directories and folders to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

d. opening or reading portions of files, and performing key word or concept searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B; and

e. using forensic tools to locate data falling within the list of items to be seized as set forth in Attachment B.

Law enforcement personnel are not authorized to conduct additional searches for any information beyond the scope of the items to be seized by this warrant as set forth in Attachment B. To the extent that evidence of crimes not within the scope of this warrant appears in plain view during the government's review, the government shall submit a new search warrant application seeking authority to expand the scope of the search prior to searching portions of that data or other item that is not within the scope of the warrant. However, the government may continue its search of that same data or other item if it also contains evidence of crimes within the scope of this warrant.

The government will return any electronic storage media removed from the premises described in Attachment A within 60 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the removed electronic storage media contains contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.